UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| MICHAEL DOWNS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO.: 1:22-cv-00009 |
| | ) |
| RAYTHEON COMPANY, | ) |
| | ) |
| Defendant. | ) |

**FIRST AMENDED COMPLAINT FOR DAMAGES AND JURY DEMAND**

Plaintiff, Michael Downs ("Downs"), by counsel, for his causes of action against the Defendant, Raytheon Company ("Raytheon"), states and alleges:

**I. INTRODUCTION**

1. Downs is bringing this claim alleging, in the alternative, a number of reasons for his termination including a violation of Section 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140, retaliation under the Family and Medical Leave Act of 1993 ("FMLA"), violation of the Americans with Disabilities Act ("ADA"), and violation of the Age Discrimination in Employment Act ("ADEA"). Downs was terminated on or about February 25, 2021 after nearly 40 years of employment with Raytheon for alleged ethical violations for supposedly mischarging a program and underreporting an estimate at complete. These allegations, aside from being pretexts, were raised only after Downs returned from his second medical leave of absence in 2020 while Downs underwent extensive and aggressive cancer treatment. Downs maintains that the real reasons Raytheon terminated him were because of his age (61 years old at the time of termination), and/or the fact that in April 2020, Downs was diagnosed with cancer and required extensive and aggressive cancer treatment resulting in Downs taking FMLA leave twice

in 2020 and incurring substantial medical expenses, the bulk being paid for by the Raytheon Employee Welfare Benefit Plan. Leading up to the allegations of ethical violations, Downs had never, in his nearly 40-year employment history with Raytheon, been the subject of discipline or told that his job performance was not satisfying or exceeding his employer's expectations. In fact, just a few months before his cancer diagnosis in April 2020, Downs was promoted to Senior Program Manager in February 2020. Downs seeks all relief available under the law, including, back pay and benefits, front pay and benefits, compensatory damages, liquidated damages, punitive damages, prejudgment interest, and costs and attorney fees.

## II. PARTIES

2. Downs is an individual citizen of Fort Wayne, Allen County, Indiana.

3. At all times relevant hereto, Raytheon was a foreign corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 870 Winter Street, Waltham, Massachusetts.

## III. JURISDICTION AND VENUE

4. This Court has both personal and subject matter jurisdiction over this case because this lawsuit involves federal laws. With respect to subject matter jurisdiction, Section 107 of 29 U.S.C. 2617 – The FMLA § 107(a)(2) – provides, in relevant part, that:

> An action to recover the damages or equitable relief prescribed in paragraph (1) may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees…

Regarding subject matter jurisdiction for the ERISA claim, ERISA § 502(f), provides:

> Civil Enforcement: Jurisdiction notwithstanding amount in controversy, citizenship of parties.
>
> The district courts of the United States shall have jurisdiction, without respect to the amount in controversy or the citizenship of

the parties, to grant the relief provided for in subsection (a) of this Section in any action.

5.      The United States District Court for the Northern District of Indiana is the proper district in which to bring this action because venue is appropriate where a defendant resides or where a defendant may be found. In order to determine a defendant's place of residence, 28 U.S.C. § 1391(c) provides:

> For purposes of this chapter, a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced. In a state which has more than one judicial circuit and in which a defendant that is a corporation is subject to personal jurisdiction at the time an action is commenced, such corporation shall be deemed to reside in any district in that State within which its contacts would be sufficient if that district were a separate State, and, if there is no such district, the corporation shall be deemed to reside in the district within which it has the most significant contacts.

Raytheon resides in the Northern District of Indiana because it has a place of business located at 1010 Production Road, Fort Wayne, Allen County, Indiana (where Downs worked prior to his termination) in the United States District for the Northern District of Indiana and, therefore, Raytheon is subject to the personal jurisdiction of this District at the time this action is commenced.

In addition, Raytheon may be found in the United States District Court for the Northern District of Indiana because Raytheon has minimal contacts in the Northern District for personal jurisdiction and, pursuant to Indiana's Long Arm Statute, would be subject to the exercise of control over its person in the Northern District of Indiana.

### IV.  FACTS

6.      Downs incorporates by reference paragraphs 1-5 of this Complaint as if same were fully set forth herein.

7. In approximately 1980, Downs began working for Raytheon and eventually being promoted to a Senior Program Manager in February 2020.

8. As a Senior Program Manager, Downs was the business leader with overall financial and operational responsibility for the performance of the programs to which he was assigned.

9. As a Senior Program Manager, among other things, Downs coordinated and prepared proposals, estimated products/service costs and developed control systems reports that measured the progress and performance of program functions.

10. Downs reported to John Havermann ("Havermann"), Senior Director, Airborne Information Operations at Raytheon.

11. In April 2020, Downs was diagnosed with cancer.

12. At that time, Downs was the Program Manager for 15 programs and 4 proposals.

13. Downs informed Raytheon of his cancer diagnosis and potential need for medical leave and/or reasonable accommodations.

14. On or about May 10, 2020, Downs was hospitalized for an eye infection and needed to take a medical leave of absence from May 9, 2020 through June 21, 2020.

15. Raytheon approved Downs' medical leave of absence and Downs was on approved FMLA leave from May 9, 2020 through June 21, 2020.

16. During this leave of absence, Downs' eye infection resolved and he started radiation treatment followed by chemotherapy.

17. When Downs returned to work on June 21, 2020, he had only had one chemotherapy treatment and did not feel as though he needed any accommodations at that time.

He reported the same to the nurse Raytheon had contact him about his medical condition and need for leave/reasonable accommodation.

18. As the chemotherapy treatments continued for a total of 17 weeks, Downs started feeling the cumulative effects of the chemotherapy and talked with Havermann several times about getting assistance and offloading some of his programs because it was becoming too overwhelming.

19. At that time, Downs had 15 programs with 7 different customers and 2-3 proposals whereas other Senior Program Managers had only 2-3 programs.

20. Each time Downs would talk with Havermann starting in approximately mid-July 2020, Downs stressed that he was overwhelmed and fatigued and requested that a Deputy Program Manager or someone take some of the programs because he required reasonable accommodations due to the cancer and related chemotherapy.

21. During the 3rd and 4th quarter of 2020, Raytheon was looking for cash flow and Downs' programs were targeted as a source for generating a portion of that cash flow. In addition to the normal work load Downs was required to work with a supplier who was behind schedule to resolve their issues and in addition, work with the customer to change the contract to allow for receiving additional cash within 2020. These tasks were consuming with multiple meetings per week to report status to Havermann and finance as well as the efforts to work with the supplier and customer. This took place from late July 2020 to late October 2020. During this time, Downs continued to make requests to Havermann for accommodation due to the added efforts and cumulative effects of the chemotherapy.

22. Havermann continued to assure Downs that he was looking for someone to assist Downs, however, Havermann never came through with the requested reasonable accommodation.

23. In approximately August 2020, Downs attended a dinner with Havermann and other Raytheon employees. At dinner, Downs specifically reiterated his request for reasonable accommodations because he was struggling from the cumulative effects of the chemotherapy. This request was witnessed by Downs' co-workers. Havermann responded by saying that he was still looking for someone.

24. Downs' second round of cancer treatment involved a stem cell transplant that was scheduled for October/November 2020 and would require Downs to be off work for 6-8 weeks.

25. Downs need for another medical leave of absence would require someone to handle his programs while he was off work. Downs requested that the person who would be handling his programs while he was out on medical leave start early because Downs was struggling from the cumulative effects of the chemotherapy.

26. Raytheon did not assign anyone until the week before Downs went onto medical leave for his stem cell transplant and the person finally assigned to help Downs did not have a program management background.

27. Downs was on his second medical leave of absence (FMLA leave) from October 31, 2020 through December 20, 2020.

28. Raytheon approved Downs' second medical leave of absence (FMLA leave).

29. Upon his return to work, Downs requested that Havermann permit the person handling Downs' programs while Downs was on medical leave continue to assist Downs for a couple of months so Downs could get up to speed following his aggressive cancer treatments.

30. Downs' request for reasonable accommodation were denied and he was told that the person handling his programs while Downs was on medical leave would be no longer providing

assistance even prior to Downs return to work and that there was no one available to help at that time but that Havermann was still looking for someone.

31. When Downs returned to work following his second medical leave of absence, he not only had to handle his original programs but was also assigned an additional 4 proposals.

32. Eventually, Havermann assigned someone to assist Downs, however, that person did not have any Program Management experience.

33. Downs reported that he was having to spend extra time helping the assigned person.

34. A new supervisor was assigned to Downs and Downs reiterated his need for reasonable accommodations due to his serious medical condition.

35. Upon Downs' return to work following his second medical leave of absence, Downs was accused of ethical violations for supposedly mischarging a program and underreporting an estimate at complete.

36. With respect to the program charging allegation, Downs denied any wrongdoing and maintains that his conduct was specifically authorized and approved by Raytheon's management. Downs and other staff had specifically asked Havermann and the financial supervisor if setting the programs up in such a manner was acceptable and were told yes. This setup was reviewed by Havermann and the financial supervisor in monthly meetings where it was obvious how the program was set up and running from the start. At no time was this approach identified as a problem until after Downs returned from his second FMLA leave following his Stem Cell Transplant and his continued request for reasonable accommodations.

37. With respect to the underestimate of costs on a program allocation, Downs denied any wrongdoing and maintains that his conduct was specifically authorized and approved by Raytheon management. Downs had received favorable information on the program and put

together an estimate with the information he had at the time. Prior to the release of the estimate at completion, the files were sent to Havermann and the financial supervisor for review. The financial supervisor had several questions and recommended changes which were all incorporated prior to the release. At no time was this approach identified as a problem until after Downs returned from his second FMLA leave following his Stem Cell Transplant and his continued request for reasonable accommodations.

38. On or about December 21, 2020, Downs received a call on the day he returned to work after the second FMLA leave following his Stem Cell Transplant with questions about two ethics issues. At no time did Raytheon's management insinuate or imply that the investigation was about Downs. In fact, Downs understood the inquiry to be about the financial analyst on the programs. With the extensive weeks of chemo therapy and the Stem Cell Transplant, Downs was not able to provide the details they were requesting at the time.

39. On or about January 12, 2021, Downs received another call with additional questions about two ethics issues. At that time, Downs provided the presentations showing that the programs were briefed to Havermann and the finance department showing how the program had been set up from the beginning and how Havermann and the finance department were fully aware of how the program was set up and had no problems with the setup.

40. On or about February 25, 2021, Downs' employment was terminated after 39 and a half years for allegedly violating Raytheon's Estimate at Complete Policy and the Cost Recording Integrity Standards Policy. Downs was replaced by a person significantly younger than him who had to be taught the job.

41. At the end of his nearly 40 years of employment at Raytheon, Downs had not received a single disciplinary notice.

42. At the end of his nearly 40 years of employment at Raytheon, Downs had received good performance reviews including a promotion in February 2020, just a few months before his cancer diagnosis.

43. At the end of his nearly 40 years of employment at Raytheon, Downs' repeated requests for reasonable accommodation were routinely denied or ignored.

44. At the end of his nearly 40 years of employment at Raytheon, Downs had required FMLA leave due to his serious medical condition on two occasions in 2020.

45. At the end of his nearly 40 years of employment at Raytheon, Downs had been utilizing the benefits under Raytheon's health insurance plan and short-term disability plan, which Downs asserts are Employee Welfare Benefit Plans under ERISA.

46. At the end of his nearly 40 years of employment at Raytheon, Downs felt as though management's attitude had changed towards him because of his cancer diagnosis, need for FMLA leave, and need for substantial medical treatment.

47. In approximately December 2018, a Vice President at Raytheon visited the Fort Wayne location where Downs worked and made the statement that the Program Managers were a bunch of old fat white guys. This statement was overheard by Downs and several of his co-workers.

## V. STATEMENT OF CLAIMS

### COUNT I

### FMLA Discrimination/Retaliation

48. Downs incorporates by reference paragraphs 1 through 47 of this Complaint as if same were fully set forth herein.

49. Raytheon violated Downs' rights under Section 105 of 29 U.S.C. 2615 – The FMLA § 105(a) – by discriminating/retaliating against Downs for having taken FMLA leave.

50. As a result of Raytheon's violation of FMLA, Downs has been damaged.

## COUNT II

### ERISA Violation

51. Downs incorporates by reference paragraphs 1 through 50 of this Complaint as if same were fully set forth herein.

52. Raytheon terminated Downs because he was utilizing the benefits under Raytheon's health insurance plan and short-term disability plan, which Downs asserts are Employee Welfare Benefit Plans, in violation of § 510 of ERISA, 29 U.S.C. § 510. The exhaustion of internal remedies, if any, should not be required as it would be futile.

53. As a result of Raytheon's violation of ERISA, Downs has been damaged.

## COUNT III

### ADA Violation

54. Downs incorporates by reference paragraphs 1 through 53 of this Complaint as if same were fully set forth herein.

55. In the alternative, Downs asserts that he was terminated in violation of the ADA in that he was perceived as disabled by Raytheon and further that Raytheon failed to engage in any type of interactive process to attempt to reasonably accommodate any disability he had or which they perceived he had and failed to reasonably accommodate his disability.

56. As a result of Raytheon's violation of ADA, Downs has been damaged.

## COUNT IV

### ADEA VIOLATIONS

57. Downs incorporates by reference paragraphs 1 through 56 of this Complaint as if same were fully set forth herein.

58. In the alternative, Downs asserts that he was terminated because of his age, 61 years old at the time of his termination. He was replaced by a much younger person who had to be taught his job.

59. The reason given to Downs for his termination i.e., violation of company policy was a pretext to simply get rid of him because of his age or for the other unlawful reasons set forth in this Complaint.

60. As a result of Raytheon's violation of ADEA, Downs has been damaged.

## VI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Michael Downs, requests the following relief:

1. judgment in his favor;
2. lost wages, including, but not limited to, back pay, front pay, lost back benefits and lost future benefits;
3. compensatory damages;
4. liquidated damages;
5. punitive damages;
6. interest calculated at the prevailing rate;
7. any equitable relief as may be appropriate;
8. attorney's fees;
9. costs of this action; and
10. all such further relief appropriate under the circumstances.

## VII.  DEMAND FOR JURY TRIAL

Plaintiff, Michael Downs, by counsel, demands a trial by jury as to all issues so triable.

        Respectfully submitted,

        ***THEISEN & ASSOCIATES, LLC***

        /s/ John C. Theisen
        John C. Theisen, #549-02
        Nathaniel O. Hubley, #28609-64
        810 South Calhoun Street, Suite 200
        Fort Wayne, IN 46802
        Telephone: (260) 422-4255
        Facsimile: (260) 422-4245
        *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and complete copy of the above foregoing document was served on March 4, 2022, via the Court's ECF system, upon:

Kenneth B. Siepman, #15561-49
Michael C. Mohler, #34703-49
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
111 Monument Circle, Ste. 4600
Indianapolis, IN 46204
Email: kenneth.siepman@ogletree.com
       michael.mohler@ogletree.com

*Attorneys for Defendant*

        /s/ John C. Theisen
        John C. Theisen